UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GLENWOOD GORMAN,

    Plaintiff,

v.

GRAND TRUNK WESTERN RAILROAD, INC., a/k/a CANADIAN NATIONAL/ILLINOIS CENTRAL RAILROAD,

    Defendant.
                                      /

Case No. 2:07-cv-12911

HONORABLE STEPHEN J. MURPHY, III

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** (document no. 20)

    The plaintiff in this lawsuit is Mr. Glenwood Gorman, a former employee of defendant Grand Trunk Western Railroad.  Gorman alleges that he was injured as a result of dangerous conditions in which Grand Trunk required him to work, and seeks to recover for his alleged damages under the Federal Employers' Liability Act, *codified at* 45 U.S.C. §§ 51 *et seq.*  Grand Trunk has moved for summary judgment, arguing that (1) Gorman's suit is barred by the applicable statute of limitations, and (2) that Gorman has not otherwise made out a FELA claim.  This motion is currently before the Court.

**FACTS**

    The evidence in the record consists largely of Gorman's own deposition testimony. Gorman had worked for Grand Trunk for 12 years, in the capacity of locomotive machinist. Dep. of Glenwood Gorman, document no. 20-4, p. 20.[1]  His duty station was Grand Trunk's

---

[1] Gorman's deposition is spread out over several attachments to Grand Trunk's motion for summary judgment.  *See* docket entry no. 20.  Since the deposition is continuously paginated, this Opinion and Order will henceforth simply refer to the page number, rather than to the specific document number.

facility at Flat Rock, Michigan. *Id.* at 39, 45, 198. Gorman's general description of his duties was "trip inspection" – that is, making sure that Grand Trunk's locomotives were worthy for service before each trip. *Id.* at 199. This required Gorman to conduct a variety of maintenance checks, and to service the engines in various ways should the checks indicate the need for it. *Id.* at 200-01.

In this suit Gorman alleges that he was injured on the job while he was changing, or completing the change of, a worn engine brake shoe.[2] The record does not reveal precisely what a brake shoe is, or what role it plays in the running of the engine. The shoes weigh approximately 25 pounds, however, *id.* at 14, and Gorman testified that checking for wear on brake shoes and changing worn shoes was part of his job duties, *id.* at 103. In fact, Gorman estimated that he changed an average of 12 brake shoes per day, and that over five days of work per week and 44 weeks per year, he had changed around 31,000 brake shoes during his 12 years as a machinist. *Id.* at 322-23.

Changing a brake shoe takes, on average, three to five minutes  *Id.* at. 179. From Gorman's testimony, the process apparently begins with the removal of a "brake adjuster pin" and the opening of a "brake adjuster rod," both of which hold the brake shoe in place. Once these are loosened, the worn brake shoe can be removed and set aside, and the new one installed. Finally, the brake adjuster rod is closed and the pin reinserted.

---

[2] In his complaint, Gorman also alleges that he was injured in connection with lifting an engineer's chair. His deposition testimony does indicate that this was part of his job duties, *id.* at 200, and that he felt a slight pain while lifting such a chair on the day in question, *id.* at 143. Elsewhere in his deposition, however, Gorman stated that he is suing based only on the injury he alleges occurred while he was changing the brake shoe. *Id.* at 205. The evidence with respect to workplace safety also deals almost exclusively with changing brake shoes. Accordingly, the Court does not find that the issue of the safety of Grand Trunk's engineer's seat processes has properly been placed before it, and will grant summary judgment on that issue.

2

The brake shoes are apparently located near the bottom of the locomotive. The result is that a machinist must either kneel or lie on the ground to change the shoes, or else the railway must construct a trackside working pit or an elevated section of track that will permit the work to be done from a standing position. *Id.* at 13. This would permit the machinist to simply reach in horizontally and remove the brake shoes without reaching much above his shoulder level. *Id.* at 299-300. Gorman testified that until sometime in the early - to mid -1990s, Grand Trunk provided these pits and elevated tracks for its machinists at its Flat Rock facility, *id.* at 304, and that he often used these facilities to change brake shoes, *id.* at 314. During that time period, however, these pits were filled in, *id.*, and Gorman subsequently was required to change all his brake shoes from a kneeling or lying position, *id.* at 14, 17. In 2003 the pits were re-dug, but Gorman testified that they were used only for federal inspections of the locomotives, and that he was not permitted to use them for changing brake shoes. *Id.* at 93, 205-06.

The incident in question here took place approximately 100 yards from the location of the redug pits. *Id.* at 312-13. One afternoon in July of 2004, Gorman identified another worn-out engine brake shoe, and prepared to replace it. Accordingly, he walked about 30 yards to a nearby shanty, took a replacement out of a storage crate there, and carried it back to the locomotive he had just inspected. *Id.* at 150, 152. Gorman quickly realized that it would not be possible to change this brake shoe from a kneeling position, because the brake adjusting pin was "frozen," or stuck, in place and had to be driven out from underneath, which could not be done except by lying down. *Id.* at 74-75. Gorman testified that although it was not "normal" for a pin to be frozen in this way, it was nevertheless a problem that machinists such as himself had to deal with from time to time. *Id.* at 47, 159. Accordingly, Gorman placed the new brake shoe on the ground next to the tracks and lay

3

down on his side between it and the locomotive. *Id.* at 154. Because of the direction in which the old shoe would come off, Gorman was obliged to lie on his left side and work one-handed with his right hand, despite being left-handed. *Id.* at. 172-73. Gorman then reached upward and used a tool known as a "buggy bar" to attempt to dislodge the pin. *Id.* at 99-100, 164-65. After about two minutes, he succeeded, *id.* at 164, and proceeded to remove the worn-out brake shoe. Then, while still lying on his left side and holding the old brake shoe with his right hand, he reached over his body and behind his back to set the old brake shoe down behind him, next to where the new one was lying. *Id.* at 174-75. He then reversed that motion in order to pick up the new brake shoe. *Id.* 186. This caused him to "twist[]" his upper body at the waist. *Id.* at 186.

Gorman's testimony was not clear as to precisely when during this process he began feeling pain. *See id* at 59, 62, 141-78. At some point, however, he noticed a slight pain in his lower back. Although Gorman acknowledges that he would have been free to take a rest break at any time, *id.* at 171, he did not do so. Instead, Gorman completed the task and began to stand up. According to Gorman's testimony, he "got into a kneeling position and grabbed hold of the truck frame to pull myself up to a standing position, part way up." *Id.* at 39. It was at this point that he "felt a sharp pain" in his lower back. *Id.* This pain was like nothing Gorman had experienced before, *id.* at 43, and was serious enough that Gorman blurted out "oh, my God," *id.* at 42. Gorman had never felt a pain like this before when standing up after replacing a brake shoe. *Id.* at 303.

Nevertheless, at first Gorman dismissed the pain as "just . . . a pulled muscle." *Id.* at 316-17. He rested for the next couple of hours, *id.* at 147, 181, but did not turn in a personal injury report or otherwise notify Grand Trunk of the incident, *id.* at 47, 148. On July 20th, however, Gorman visited Henry Ford Wyandotte Hospital, seeking treatment for

4

his back. *Id.* at 57, 329; Henry Ford Wyandotte Hospital Patient Referral Information Sheet, Document no. 20-15. In the following days, Gorman also found himself unable to perform all of his job duties. *Id.* at 249-50, 285. Finally, on September 4th, 2004, following an examination by his doctor, Gorman took a medical leave of absence without pay that continues to the present day, *id.* at 54-56.

## LEGAL STANDARDS

The Federal Employer's Liability Act provides in relevant part that

> Every common carrier by railroad . . .shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51. Under the statute, an employee may recover even if his injury was caused in part by his own negligence, but his damages award will be reduced in proportion to which negligence can be attributed to him. *Id.* § 53. Accordingly, in order to make out a FELA claim, a plaintiff must

> prove that (1) an injury occurred while the plaintiff was working within the scope of his or her employment with the railroad, (2) the employment was in the furtherance of the railroad's interstate transportation business, (3) the employer railroad was negligent, and (4) the employer's negligence played some part in causing the injury for which compensation is sought under the Act.

*Aparicio v. Norfolk & W. Ry. Co.*, 84 F. 3d 803, 810 (1996) (abrogated on other grounds, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)) (citation omitted).

Whether a railroad has been negligent under the FELA is a question of federal, not state, law, *Urie v. Thompson*, 337 U.S. 163, 174 (1949), and is to be determined with reference to all the attendant facts and circumstances. *Bailey v. Cent. Vt. Ry.*, 319 U.S. 350, 353 (1943). FELA is not a worker's compensation scheme, and under it "[t]he

5

employer is not held to an absolute responsibility for the reasonably safe condition of the place, tools, and appliances, but only to the duty of exercising reasonable care to that end." *Baltimore & Ohio S.W. R. Co. v. Carroll*, 280 U.S. 491, 496 (1931).  Additionally, proximate causation, in the form of "reasonable foreseeability of harm[,] is an essential ingredient of Federal Employers' Liability Act negligence."  *Gallick v. Baltimore & Ohio R. Co.*, 372 U.S. 108, 117 (1963).  Finally, the Sixth Circuit has held that "[a] FELA defendant cannot be held liable for a defective condition on or in its property "absent proof that such defect was known, or should or could have been known, by defendant, with opportunity to correct it." *Miller v. Cincinnati, New Orleans & Tex. Pac. Ry. Co.*, 317 F. 2d 693, 695 (6th Cir. 1963).

## SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Martin v. Ohio Turnpike Comm'n*, 968 F.2d 606, 608 (6th Cir.1992).

In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party.  *60 Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987).  The Court is not required or permitted, however, to judge the evidence or make findings of fact. *Id.* at 1435-36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists.  *Id.* at 1435.

6

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir.1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993). "If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *see Celotex*, 477 U.S. at 322-23; *Matsushita*, 475 U.S. at 586-87. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1995).

Nevertheless, the courts have given Rule 56 a generous application in the context of FELA claims. Accordingly, since "Congress has favored Federal Employers' Liability Act plaintiffs with a jury resolution of all colorable factual issues," a FELA plaintiff is required "to present more than a scintilla of evidence in order to create a jury question on the issue of employer liability, but not much more." *Aparicio*, 84 F. 3d at 810*.*

**ANALYSIS**

I.   Statute of Limitations

7

Grand Trunk first argues that Gorman's claim is barred by the statute of limitations. This argument is complicated by the uncertainty surrounding the actual date that Gorman's injury occurred.

A FELA claim must be brought within three years of the date that it accrues. 45 U.S.C. § 56. Gorman filed his complaint, document no. 1, on July 12th, 2007. Thus, his claim was timely filed if he was injured on or after July 12th, 2004. According to Gorman's recollections, his injury occurred on a Thursday, and on July 17th, 2004, which would make his claim timely. Dep. of Glenwood Gorman, p. 290. The hospital record from his July 20th visit also indicates that the injury occurred on July 17th. Henry Ford Wyandotte Hospital Patient Referral Information Sheet, document no. 20-15.

Grand Trunk, however, points out that July 17th, 2004 was not a Thursday but a Saturday, and has adduced in evidence Gorman's time card showing that he was not at work that day. Aff. of Annette M. Duffany, document no. 20-18, ¶ 6 & p. 5. When confronted with this inconsistency at his deposition, Gorman admitted that he could not be sure what date or even day of the week in July 2004 the injury had occurred on. Dep. of Glenwood Gorman, pp. 316, 333-34, 336. On examination by his own counsel, however, Gorman stated that while he was unsure of the date, the injury occurred less than a week before his hospital visit began. *Id.* at 337. This would mean that the earliest the accident could have occurred would have been July 14th, 2004. *Id.*

The parties dispute which of them bears the burden of proof on the issue of whether Gorman's complaint was filed within the limitations period. Gorman notes clear Sixth Circuit precedent that, "[b]ecause the statute of limitations is an affirmative defense, the burden is on the defendant to show that [it] has run." *Campbell v. Grand Trunk W. R.R. Co.*, 238 F. 3d 772, 775 (6th Cir. 2001). Grand Trunk cites authority from other Circuits in

favor of the opposite rule – that compliance with the statute of limitations is an element of a FELA plaintiff's claim, on which the plaintiff therefore bears the burden of proof. *See Carpenter v. Erie R. Co.*, 132 F. 2d 362, 363 (3d Cir. 1942); *see also Emmons v. S. Pac. Transportation Co.*, 701 F. 2d 1112, 1118 (5th Cir. 1983); *Johnson v. Norfolk & W. Ry. Co.*, No. 92-1719, 1993 WL 17061, at *2 (4th Cir. Jan. 28, 1993). *Campbell* makes it clear that this is not the law of this Circuit.

In any event, even were the burden of proof on Gorman on this issue, the Court would conclude that he has generated a jury question with respect to it. Although he initially expressed uncertainty as to when his injury occurred, Gorman later asserted that he visited the hospital within one week of the injury. Based on the undisputed date of his hospital visit, a jury that believed this testimony would necessarily conclude that the complaint was filed within three years of the injury. Accordingly, under any standard, summary judgment is not appropriate based on the statute of limitations.

II.     Substance of the FELA Claim

Grand Trunk argues that Gorman has failed to establish multiple elements of his FELA claim.

A. Unreasonable Danger

First, Grand Trunk argues that Gorman has not established that the lack of pits or elevated tracks was an unreasonably dangerous condition. In support of this, it notes that for many years, both Gorman and many other machinists had been replacing engine brake shoes without the use of a pit or elevated rails. Indeed, Gorman himself acknowledged that he had performed this task many thousands of times, without suffering any injury from it. Dep. of Glenwood Gorman at 19. Grand Trunk further notes that there is testimony from any expert in ergonomics as to whether changing brake shoes from a lying position poses

9

any health risk. In a similar vein, Grand Trunk argues that there is no evidence suggesting that the use of a pit or elevated rail would be even comparatively safer than kneeling or lying to do the same task.

In response, Gorman offers his own opinion, as well as those of three of his fellow Grand Trunk employees, that it was unsafe to change brake shoes without using a pit or elevated track. *See id.* at 21-24, 32-33; aff. of Gerald F. Norton, document no. 21, p. 30; aff. of Raymond McGrainie, document no. 21, p. 32; aff. of Roger Gorman, document no. 21, p. 34. He also notes the testimony of Mr. Orren Thomas, a senior mechanical supervisor for Grand Trunk who had himself changed brake shoes, although never in a pit. Thomas nevertheless testified that using a pit to do so lessened the strain on one's back, dep. of Orren Thomas, document no. 21, p. 44, and that it would be "ideal" for inspection brake shoes because it would bring the machinist more to a level with the shoe, *id.* at 48; *see also id.* at 55. Thomas also stated that changing a brake shoe from a lying position would require "twisting" that might violate safety rules applicable to Grand Trunk employees, *id.* at 54-55, and that Gorman would have been less likely to violate this rule in a pit, *id.* at 57.

Grand Trunk argues that the bare opinions of Gorman, Thomas and the affiants as to the safety of various railroad practices is not competent evidence because none of them are qualified as experts on ergonomics or railroad safety. The Court expresses no view on the merits of this evidentiary question, however, because it concludes that even without considering these opinions, and without any kind of expert testimony, there is sufficient evidence in the record to permit a jury to find that the lack of pits or elevated rails was unreasonably dangerous. In other words, Gorman's simple explanation of the situation is sufficient for a jury to find that the conditions were unreasonable, if it believed him. It is a

commonsense proposition that one's long-term musculoskeletal health is better served by reaching straight forward from one's body to repeatedly lift a 20-odd-pound object -- as would be possible with a pit or elevated track system-- than it is by doing the same task lying on one's side and reaching above one's head.  Nor does the Court find that a jury would need to have any difficulty in concluding that Gorman's inability to use the pits, under the circumstances, was not reasonable.

Grand Trunk stresses that it is not required to provide an absolutely safe workplace, and the Court agrees with this proposition -- the statute's requirement is only that the railroad exercise reasonable care for its employees' safety.  But whether any given arrangement is reasonably safe cannot be determined, as Grand Trunk seems to suggest, without any consideration of possible alternative arrangements.  Instead, whether the conditions of a workplace are reasonably safe depends on a comparison of the marginal benefits and costs of an available safer alternative.  *See United States v. Carroll Towing Co.*, 159 F. 2d 169, 173 (2d Cir. 1947) ("if the probability be called P; the injury, L; and the burden, B; liability depends upon whether B is less than L multiplied by P: i.e., whether B less than PL").  Thus, the proper inquiry here is not whether requiring machinists to change brake shoes from a lying position could be regarded as "reasonably safe" when considered in a vacuum, but rather whether it was reasonable in light of the burden that safer alternatives would have imposed on Grand Trunk, as compared to the increase in safety that the alternatives would offer.

Here, a jury that believed Gorman's testimony could reasonably find that the costs to Grand Trunk of permitting him to use the pits was very low -- the pits were already in place, only 100 yards from where Gorman was working.  Thomas did testify that moving a locomotive to the pits caused a total delay of between twenty minutes and an hour,

11

cumulating throughout the entire process, dep. of Orren Thomas, document no. 21, pp. 45, 49-50, but whether this delay would outweigh the safety gains from using the pits is properly a question for the jury, and not for the Court. Thomas himself stated that he "couldn't see any reason" why a machinist would not be able to use the pits if the machinist found it necessary. *Id.* at 52-53. Although the risk of injury from changing brake shoes while lying down was apparently relatively low, the record would also permit a jury to find that the machinists' safety would be substantially improved by the provision of pits. Therefore, it would be well within the bounds of reason for a jury to conclude that it was unreasonably dangerous for Grand Trunk to refuse to let Gorman use the pits to change engine brake shoes, and summary judgment is not appropriate on this basis.

### B. Notice and Foreseeability

For many of the same reasons, Grand Trunk argues that could not have had notice that requiring its machinists to change brake shoes from a lying position was unreasonably dangerous, or foreseen that injuries might occur from this. Grand Trunk again notes that there had not previously been injuries from this practice, either to Gorman or to other machinists. In response, Gorman points to his own testimony that he had complained to his supervisor and to his union representative about not having a pit to change brake shoes from. Dep. of Glenwood Gorman, pp. 19-25. Although Gorman disclaimed any personal knowledge of other similar complaints, *id.* at 19, 96, the affiants Norton, McGrainie, and Roger Gorman also claim to have made such complaints. Document no. 21, pp. 30, 32, 34.

In the Court's view, even without any of these warnings, Grand Trunk could reasonably be found to have had notice of the dangers of changing brake shoes while lying down. Changing worn brake shoes was an integral part of Grand Trunk's business, and the

evidence indicates that it was an extremely common occurrence at the railroad's maintenance facilities. The record also indicates that Grand Trunk was aware that pits were available to do this work at the Flat Rock facility and had been used for it in the past, but that the current practice was for machinists to kneel or lie on their sides. In light of the obvious extra stress this would place on the machinists' bodies, Grand Trunk had all the notice needed of the dangerous condition. Any express notice it had from Gorman or others only bolsters this conclusion. Accordingly, summary judgment is not appropriate on this basis.

### C. Causation

Second, Grand Trunk argues that any negligence it may have committed was nonetheless not the cause of Gorman's alleged injury. In support of this argument, Grand Trunk points to several pieces of evidence.

First, Grand Trunk again notes that Gorman maintains that the injury took place on July 17th, and that he was not at work on that date. Accordingly, says Grand Trunk, the injury must have been caused by some non-work activity. This contention is without merit. Gorman has testified in detail that the injury occurred at his workplace, and there is no evidence describing any other non-work event that could have injured his back in July of 2004. Indeed, although Gorman did indicate a strong belief that the injury took place on the 17th, he also acknowledged that, since the 17th was a Saturday and he may not have been working then, he may have "gotten [his] dates mixed up." Dep. of Glenwood Gorman, p. 333. The Court concludes that a jury could very reasonably accept this explanation.

Second, Grand Trunk argues that according to Gorman's own testimony, the pain in his back became serious only when he was standing up *after* changing the brake shoe. Accordingly, it suggests that it was not caused by the requirement that Gorman lie down

13

to perform that operation. This argument is also meritless. Although his testimony was somewhat equivocal, Gorman did suggest that the pain began at some point *during* the process of changing the brake shoe. More importantly, even if the injury did occur only as Gorman was rising from the lying position, this action itself -- that is, getting back to his feet-- would not have been necessary if Gorman had been able to perform the entire brake shoe replacement from a standing position, as he would have if a pit had been available.

Grand Trunk finally maintains that even if Gorman had been injured *while* changing the shoe, the undisputed evidence is that Grand Trunk did not require him to reach behind his back from a lying position, or to continue working even after experiencing back pain. Accordingly, Grand Trunk argues that Gorman's injury was caused by his own negligence, in (1) placing the brake shoes behind him, thus necessitating the twisting motion that he complains of, and (2) working through pain, which eventually worsened and caused the injury Gorman alleges here.

It is not clear, however, that Gorman did have the choice to place the brake shoes in an area that would not require him to twist. Thomas testified that, in order to safely lift the brake shoes up to the locomotive, a machinist "would want to get in as tight as you could so your extremities are not out." Dep. of Orren Thomas, document no. 21, p. 53; *see also id.* p. 69. This would appear to leave little or no place for the brake shoes except behind the machinist's back or next to his head. Thus, a reasonable jury could conclude that some back strain would be inevitable when working from the awkward position described by Gorman. Further, a jury could rather common-sensically conclude that Gorman's failure to stop work when he initially felt the pain caused an exacerbation of an injury that had already occurred.

Accordingly, a jury would not be compelled to find that Gorman's negligence was the sole cause of his injury. Under the FELA, any negligence by Gorman that contributed *partially* to causing his injuries may reduce his recovery, but will not bar it altogether. Summary judgment is therefore not appropriate on this basis.

### ORDER

**WHEREFORE**, it is hereby **ORDERED** that defendant's motion for summary judgment is **GRANTED IN PART**, insofar as plaintiff asserts that he was injured while lifting an engineer's chair. The motion is **DENIED IN PART**, in all other respects.

**SO ORDERED.**

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: August 10, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 10, 2009, by electronic and/or ordinary mail.

Alissa Greer
Case Manager